# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN CHEMISTRY COUNCIL, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:12-cv-01156-JEB |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, NATIONAL INSTITUTES OF HEALTH, NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES and NATIONAL CANCER INSTITUTE, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiff American Chemistry Council, Inc. ("ACC") respectfully moves this Court for summary judgment directing the United States Department of Health and Human Services, the National Institutes of Health, the National Institute of Environmental Health Sciences and the National Cancer Institute to produce information withheld in violation of the Freedom of Information Act, 5 U.S.C. § 552, and the Administrative Procedure Act, 5 U.S.C. § 501 *et seq.*

This Motion is based upon the accompanying Memorandum of Points and Authorities, the Declaration of Blake A. Biles, Plaintiff's Statement of Material Facts As to Which Plaintiff Contends There Is No Genuine Issue, the Proposed Order and the Joint Appendix of the Administrative Record, in accordance with Local Civil Rules 7(h) and 7(n).

Dated:  November 8, 2012

Respectfully submitted,

/s/ Blake A. Biles
Blake A. Biles
(D.C. Bar No. 441679)
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C.  20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
E-mail: blake.biles@aporter.com

Kent A. Yalowitz
*Pro hac vice*
ARNOLD & PORTER LLP
399 Park Avenue
New York, N.Y.  10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399
E-mail: kent.yalowitz@aporter.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN CHEMISTRY COUNCIL, INC., | : | |
| | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:12-cv-01156-JEB |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, NATIONAL INSTITUTES OF HEALTH, NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES and NATIONAL CANCER INSTITUTE, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF AMERICAN CHEMISTRY COUNCIL, INC.'S MOTION FOR SUMMARY JUDGMENT

Blake A. Biles
(D.C. Bar No. 441679)
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C.  20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
E-mail: blake.biles@aporter.com

Kent A. Yalowitz
*Pro hac vice*
ARNOLD & PORTER LLP
399 Park Avenue
New York, N.Y.  10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399
E-mail: kent.yalowitz@aporter.com

*Counsel for Plaintiff American Chemistry Council, Inc.*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................. iii

**PRELIMINARY STATEMENT** ........................................................................................... 1

**PROCEDURAL HISTORY** ................................................................................................ 1

**STATEMENT OF FACTS** .................................................................................................. 1

**ARGUMENT** ........................................................................................................................ 7

**I.    DEFENDANTS CANNOT SHOW THAT THEIR SEARCH FOR THE REQUESTED
RECORDS WAS LEGALLY ADEQUATE UNDER THE FOIA.** ......................................... 7

   **A.    Defendants Must Provide A Detailed Affidavit Regarding Their Search of the NCI
Files.** ……………………………………………………………………………………9

   **B.    Defendants Must Produce The Requested Information In Accordance With The
Procedures Established Under The FOIA.** ......................................................................... 11

      **1.    The FOIA, The Shelby Amendment, OMB Circular A-110 And HHS
Regulations Require Defendants To Produce The Requested Information, And To
Obtain From The Grantees Information Which Defendants Do Not Possess.** ............... 11

      **2.    Defendants' Justifications For Failing To Provide The Zhang Study Data Are
Incorrect As A Matter Of Law.** .......................................................................................... 14

**II.    ALTERNATIVELY, DEFENDANTS HAVE A LEGAL OBLIGATION THAT MUST
BE ENFORCED THROUGH THE APA.** .............................................................................. 19

   **A.    ACC's Claim Satisfies The Threshold Requirements Under The *Norton*
Framework.** .............................................................................................................................. 20

      **1.    Defendants Have Failed To Take A Discrete Agency Action.** .............................. 20

      **2.    Defendants Are Legally Required To Obtain The Data From The Grantee.** ...... 21

**III.    THE SHELBY AMENDMENT AND OMB CIRCULAR A-110 CREATE A
MINISTERIAL DUTY THAT MAY BE ENFORCED THROUGH MANDAMUS.** .......... 22

**CONCLUSION** ................................................................................................................... 23

## TABLE OF AUTHORITIES

### Cases

*Akers v. Liberty Mut. Grp.*, 847 F. Supp. 2d 21 (D.D.C. 2012)..................................................... 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986))............................................................... 9

*Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v. Fed. Labor Relations Auth.*, 22 F.3d
    1150 (D.C. Cir. 1994) ........................................................................................................ 25

*Beaty v. Food & Drug Admin.*, 853 F. Supp. 2d 30 (D.D.C. 2012)............................................... 25

*Blancett v. U.S. Bureau of Land Mgmt*, No. Civ. A. 04-2152, 2006 WL 696050 (D.D.C. Mar. 20,
    2006) ............................................................................................................................... 24

*Brodie v. U.S. Dep't of Health & Human Servs.*, 796 F. Supp. 2d 145 (D.D.C. 2011)................ 23

*Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508 (D.C. Cir. 1996).......................... 17

*Campbell v. U.S. Dep't of Justice*, 193 F. Supp. 2d 29 (D.D.C. 2001) ...................................... 8, 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 9

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ......................................................................... 20

*Citizens for Responsibility & Ethics in Wash. v. U.S. Secs. & Exch. Comm'n*, 858 F. Supp. 2d 51
    (D.D.C. 2012) .................................................................................................................. 27

*Council of & for the Blind of Del. Cnty. Valley v. Regan*, 709 F.2d 1521 (D.C. Cir. 1983) ........ 27

*Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83 (D.D.C. 2009)........................... 9

*ExxonMobil Corp. v. Dep't of Commerce*, 828 F. Supp. 2d 97 (D.D.C. 2011)............................ 17

*Forsham v. Harris*, 445 U.S. 169 (1980)................................................................................... 13

*Friends of Blackwater v. Dep't of the Interior*, 391 F. Supp. 2d 115 (D.D.C. 2005)................... 11

*Goland v. Cent. Intelligence Agency*, 607 F.2d 339 (D.C. Cir. 1978) ......................................... 10

*Gulfstream Aero. Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988) .......................................... 27

*N. Colo. Water Conservancy Dist. v. Fed. Energy Reg. Comm'n*, 730 F.2d 1509 (D.C. Cir. 1984)
    ...................................................................................................................................... 25

*N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62 (D.D.C. 2007)................................ 28

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644 (2007) ............................. 28

*Nat'l Labor Relations Bd. v. Sears*, 421 U.S. 132 (1975)........................................................... 13

*Norton v. So. Utah Wilderness Alliance*, 542 U.S. 55 (2004)................................................ 24, 25

*Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57 (D.C. Cir. 1990) .............................................. 11

*Pierce v. Underwood*, 487 U.S. 552 (1988)............................................................................... 28

*Pohl v. EPA*, No. 09-1480, 2010 WL 4388071 (W.D. Pa. Oct. 29, 2010) ................................... 15

*Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640 (D.C. Cir. 1998) .................................. 20

*Shays v. Fed. Election Comm'n*, 414 F.3d 76 (D.C. Cir. 2005).................................................. 18

*Sullivan v. Zebley*, 493 U.S. 521 (1990) ................................................................................ 18

*Uhar & Co v. Jacob*, 840 F. Supp. 2d 287 (D.D.C. 2012) ......................................................... 9

*United States v. Monsanto*, 491 U.S. 600 (1989)..................................................................... 28

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) .................................................................... 10

*ViroPharma Inc. v. Dep't of Health and Human Servs.*, 839 F. Supp. 2d 184 (D.D.C. 2012)..... 10

*Wilbur v. Cent. Intelligence Agency*, 273 F. Supp. 2d 119 (D.D.C. 2003)............................ 10, 11

## Statutes

28 U.S.C. § 1361 ..................................................................................................................... 26

42 U.S.C. § 241(b)(4)(A) ........................................................................................................... 3

42 U.S.C. § 241(b)(4)(D) ........................................................................................................... 3

42 U.S.C. §§ 201-300ff-72 ......................................................................................................... 3

5 U.S.C. § 501............................................................................................................................ 1

5 U.S.C. § 551(13) ................................................................................................................... 24

5 U.S.C. § 552............................................................................................................................ 1

5 U.S.C. § 702.......................................................................................................................... 23

5 U.S.C. § 704.......................................................................................................................... 24

Pub. L. No. 105-277, Title III, 112 Stat. 2681 (Oct. 21, 1998) ........................................... 14, 18

Pub. L. No. 95-622, § 262, 92 Stat. 3412 (Nov. 9, 1978)............................................................ 3

## Other Authorities

Announcement of Availability of the Report on Carcinogens, Twelfth Edition, 76 Fed. Reg. 36,923 (June 23, 2011)............................................................................................................ 4

Certain Polybrominated Diphenylethers; Significant New Use Rule and Test Rule, 77 Fed. Reg. 19,862 (Apr. 12, 2010)........................................................................................................ 22

EPA, *Toxicological Review of Formaldehyde – Inhalation Assessment (CAS No. 50-00-0) in Support of Summary Information on the Integrated Risk Information System (IRIS)* (draft dated June 2, 2010).................................................................................................................... 21

Final Revision to OMB Circular A-110, 64 Fed. Reg. 54,926 (Oct. 8, 1999)....................... 15, 19

Final RoC, Background Document for Formaldehyde (Jan. 22, 2010) ......................................... 5

H.R. Rep. No. 95-1192, at 28 (1978)......................................................................................... 4

Luoping Zhang, et al, *Occupational Exposure to Formaldehyde, Hematoxicity and Leukemia-Specific Chromosome Changes in Cultured Myeloid Progenitor Cells*, J. Epidemiology, Biomarkers & Prevention, 19(1) (Jan. 2010).................................................................. 5, 6, 19

National Emissions Standards for Hazardous Air Pollutants: Mineral Wool Production and Wool Fiberglass Manufacturing, 76 Fed. Reg. 72,770 (Nov. 25, 2011) ............................................. 22

National Primary Drinking Water Regulations; Announcement of the Results of EPA's Review of Existing Drinking Water Standards, 75 Fed. Reg. 15,500 (Mar. 29, 2010) ......................... 22

Request for Comments on Clarifying Changes to Proposed Revision on Public Access to Research Data, 64 Fed. Reg. 43,786 (Aug. 11, 1999) ............................................................. 26

S. Rep. No. 88-813 (1966) ..................................................................................................... 13

U.S. Dep't of Health & Human Servs., *Report on Carcinogens* (12th ed. 2011) ................. 5, 6, 20

## **Regulations**

2 C.F.R. § 215.36(b) .............................................................................................................. 25

2 C.F.R. § 215.36(c) .............................................................................................................. 17

2 C.F.R. § 215.36(d) ........................................................................................................... 1, 15

2 C.F.R. § 215.36(d)(1).......................................................................................................... 18

29 C.F.R. § 1900.1200(b)(1)................................................................................................... 20

29 C.F.R. § 1910.1200(c)........................................................................................................ 20

29 C.F.R. § 1910.1200(d)(4)(i)............................................................................................. 4, 20

29 C.F.R. § 1910.1200(g)(2).................................................................................................. 4, 21

40 C.F.R. § 707.60(c)(2)(i) ................................................................................................... 4, 21

45 C.F.R. § 5.35(b)(2), (c) ...................................................................................................... 7

45 C.F.R. § 74.36(d) ............................................................................................................... 1

45 C.F.R. § 74.36(d)(1)..................................................................................................... passim

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff American Chemistry Council, Inc. ("ACC") respectfully moves for summary judgment directing the United States Department of Health and Human Services ("HHS"), the National Institutes of Health ("NIH"), the National Institute of Environmental Health Sciences ("NIEHS") and the National Cancer Institute ("NCI") to produce information withheld in violation of the Freedom of Information Act (the "FOIA"), 5 U.S.C. § 552, and the Administrative Procedure Act (the "APA"), 5 U.S.C. § 501 *et. seq.*

## PRELIMINARY STATEMENT

ACC seeks information from HHS which ACC has duly requested and is entitled to receive.  Federal law requires Defendants to take prescribed measures so that this information is made available to ACC (and other members of the public) through the procedures set forth in the FOIA.  However, Defendants have unlawfully refused to produce the requested information.

## PROCEDURAL HISTORY

ACC filed its Complaint on July 12, 2012.  ACC asserts three claims: (1) violation by Defendants of the FOIA, the Shelby Amendment, Office of Management and Budget Circular A-110 (codified at 2 C.F.R. § 215.36(d)) and the HHS regulations implementing the Shelby Amendment (codified at 45 C.F.R. § 74.36(d)) (Count I); (2) violation by Defendants of the APA (Count II); and (3) statutory mandamus (Count III).[1]

## STATEMENT OF FACTS

### 1.  ACC

ACC is a non-profit trade association based in Washington, D.C. representing companies engaged in the business of chemistry.  (*See* Compl. ¶ 4.)  *See also* ACC, About ACC, *at*

---

[1] Each count is an independent and sufficient basis to grant all of the relief that Plaintiff seeks.

www.americanchemistry.com/About (last visited Nov. 1, 2012) (Exhibit 1[2]).  ACC members apply the science of chemistry to make innovative products and services that make people's lives better, healthier and safer.  *See* ACC Store, About ACC, *at* store.americanchemistry.com/acc_ aboutus.aspx (last visited Nov. 5, 2012) (Exhibit 2).  ACC is committed to improved environmental, health and safety performance through, among other efforts: (1) health and environmental research and product testing, and (2) advocacy designed to address major public policy issues.  *See id.*[3]  Some members of ACC produce formaldehyde and products containing formaldehyde.

## 2. Formaldehyde

Formaldehyde is a simple chemical compound that is found in nature and comprised of hydrogen, oxygen and carbon.  It is a colorless, flammable gas that occurs naturally in the environment from combustion, biodegradation and photochemical decomposition of organic material.  Formaldehyde also is manufactured as a commercial product, including by ACC members, and is used by a range of companies to produce many products, including leather, plywood, furniture, foam insulation, plastic, paints, carpets, fabrics, paper and disinfectants. Industrial sectors that use formaldehyde include the wood processing, non-metallic mineral products, pulp and paper, oil and gas, mining, chemical/chemical products, and primary-metals sectors.  Motor vehicles, power plants, incinerators, refineries, wood stoves, kerosene heaters, fireplaces, food cooking and cigarettes also lead to emissions of formaldehyde.  In addition,

---

[2] Exhibits described herein are attached to the Declaration of Blake A. Biles in Support of Plaintiff's Motion for Summary Judgment.

[3] For example, in June 2010, ACC formed the Formaldehyde Panel to represent producers, suppliers and users of formaldehyde products, as well as trade associations representing key formaldehyde applications.  *See* ACC, Products & Technology: Formaldehyde, *at* www.americanchemistry.com/ProductsTechnology/Formaldehyde (last visited Nov. 1, 2012) (Exhibit 3).  The Panel's primary activities include research, advocacy and marketplace outreach. *See id.*

formaldehyde is essential for metabolic processes, and is produced and exhaled as a gas in small amounts by most living organisms, including humans.

### 3.   The 12th RoC

This action arose following issuance by the National Toxicology Program ("NTP"), a component entity of Defendant HHS, of the twelfth and most recent version of the Report on Carcinogens (the "RoC"). Issuance of the RoC has been mandated since 1978, when Congress amended the Public Health Service Act, 42 U.S.C. §§ 201-300ff-72, to direct the Secretary of Health, Education and Welfare (as HHS then was known) (the "Secretary") to "publish a biennial report which contains . . . a list of all substances . . . known to be . . . or [that] may reasonably be anticipated to be carcinogens." 42 U.S.C. § 241(b)(4)(A); *see also* Pub. L. No. 95-622, § 262, 92 Stat. 3412 (Nov. 9, 1978). The Secretary, in turn, delegated its responsibility to the NTP, an interagency program within HHS that is headquartered at NIEHS. *See* History of the RoC – National Toxicology Program, ntp.niehs.nih.gov/?objectid=03CA7EEA-CBAA-EB17-20B4B2C329C5DDCF (last visited Nov. 1, 2012) (Exhibit 4).

Published biennially, each edition of the RoC is cumulative, *i.e.*, it includes newly reviewed substances as well as those listed in previous editions. *See* 42 U.S.C. § 241(b)(4)(D); *see also* NTP, About the Report on Carcinogens, *at* ntp.niehs.nih.gov/?objectid=03C9B512 ACF8-C1F3-ADBA53CAE84F635 (last visited Nov. 1, 2012) (Exhibit 5). For each listed substance, the RoC includes a substance profile which provides information concerning: (1) studies that, according to the NTP, support the listing (including, *e.g.*, studies on humans and animals); (2) potential sources of exposure to humans; and (3) current federal regulations to limit exposures. (*See* Exhibit 5.) Congress intended that the RoC be used by state, federal and local regulators as a "comprehensive" report of "all known or suspected carcinogenic agents." H.R.

Rep. No. 95-1192, at 28 (1978); *see also* NIEHS, Since You Asked: 12th Report on Carcinogens, *at* www.niehs.nih.gov/news/sya/sya-roc/ (last visited Nov. 1, 2012) ("The RoC can be used by regulatory agencies and others for decision making.") (Exhibit 6).  Consistent with this objective, several federal agencies have developed regulations that automatically impose requirements with respect to substances that are listed as known or reasonably anticipated "carcinogens" in the RoC.  *See, e.g.*, 29 C.F.R. § 1910.1200(d)(4)(i), (g)(2) (Occupational Health and Safety Administration ("OSHA") regulations requiring employers to obtain or develop material safety data sheets for carcinogens or potential carcinogens which they manufacture, import or use); 40 C.F.R. § 707.60(c)(2)(i) (Environmental Protection Agency ("EPA") regulations requiring exporters to provide notices of export of certain chemicals containing specified percentages of carcinogens).

The NTP issued the twelfth edition of the RoC on June 10, 2011 (the "12th RoC").  *See* Announcement of Availability of the Report on Carcinogens, Twelfth Edition, 76 Fed. Reg. 36,923, 36,924 (June 23, 2011).  The 12th RoC included a revised listing of formaldehyde as "known to be a human carcinogen" based on an association in humans with nasopharyngeal cancers ("NPCs"), cancers of the nasal cavity or paranasal sinuses ("sinonasal") and lymphohematopoietic cancer, specifically myeloid leukemia.  *See id.*; *see also* 12th RoC at 195. The NTP first listed formaldehyde in the 2nd RoC (issued in 1981), as "reasonably anticipated to be a human carcinogen."  *See* 12th RoC at 195.  Subsequent editions until the 12th RoC primarily limited formaldehyde's potential cancer associations in humans to certain NPCs and sinonasal cancers, and did not include an association with either lymphohematopoietic cancer or leukemia.

4. **The Zhang Study**

As support for the revised listing, the NTP cited a 2010 research article, published in the Journal of Epidemiology, Biomarkers & Prevention, entitled *Occupational Exposure to Formaldehyde, Hematoxicity and Leukemia-Specific Chromosome Changes in Cultured Myeloid Progenitor Cells*. *See* NTP, Final RoC, Background Document for Formaldehyde, at xv, 318, 361, 385, 496-97 (Jan. 22, 2010); *see also* 12th RoC at 199-200. Dr. Luoping Zhang of the University of California at Berkeley School of Public Health was the lead author of the article. *See* J. Epidemiology, Biomarkers & Prevention, 19(1), at 80 (Jan. 2010). However, 33 other persons served as co-authors, including 11 individuals affiliated with NCI. *See id.* The authors of the "Zhang Study," as it is often referenced, evaluated the potential health effects of exposure to formaldehyde, including carcinogenicity, by examining 94 workers in China. *See id.* at 80, 82. The authors concluded that formaldehyde-exposed workers had lower counts of white blood cells, granulocytes, platelets, red blood cells and lymphocytes than did non-exposed workers, and that induction of leukemia by formaldehyde is "biologically plausible." *See id.* at 80, 84-87; *see also* 12th RoC at 200 (citing the Zhang Study). The Zhang Study was supported in part by grants from the Intramural Research Program of the NIH (National Cancer Institute) and from the NIEHS. *See* Zhang Study at 87.

5. **ACC's Request**

By letter dated November 7, 2011, ACC requested from NIH "copies of all Records related to" the Zhang Study, including records associated with NIH and NIEHS grants that provided funding for the Study. (*See* Compl. ¶ 24; Admin. App'x at 1-2.[4]) Specifically, ACC requested records related to: (1) the Zhang Study's protocol and methodology; (2) information

---

[4] Citations to "Admin. App'x" refer to the Administrative Record Appendix.

and data obtained regarding the subjects of the Study; and (3) analyses, results, findings and conclusions of the Study.  (*See id.*)  ACC specified that these records "may be a part of, or otherwise associated with [the Grants] under the Intramural Research Program of the NIH (National Cancer Institute) and the [NIEHS]."  (*See id.*)

NIH acknowledged receipt of Plaintiff's request by letter dated November 17, 2011.  (*See* Compl. ¶ 25; Admin. App'x at 19-21.)  NIH sent a "final response" to Plaintiff's request in the form of a letter dated December 1, 2011.  (*See* Compl. ¶ 26; Admin. App'x  at 22-25.)  NIH attached to its letter 108 pages of material deemed by NIH to be "responsive" to ACC's request, consisting solely of the Application for Federal Assistance for Grant #R01ES017452-01, submitted by Dr. Zhang in 2008.  (*See* Compl. ¶ 26; Admin. App'x  at 26-129.)  Despite explicit references to NCI in both the Zhang Study and ACC's November 7, 2011 request – and the fact that numerous NCI scientists co-authored the research article regarding the Zhang Study – NIH referred ACC's request only to NIEHS for response.  NIH also did not request records from Dr. Zhang or any other author of the study, responding instead that NIH was not required to do so because the data requested by ACC do not meet the criteria set forth in the Office of Management and Budget's ("OMB") Circular A-110.  (*See* Compl. ¶ 28; Admin. App'x at 24.)

**6.  ACC's Appeal**

By letter dated January 4, 2012, ACC timely appealed NIH's response as being "incomplete and otherwise deficient" on the bases that: (1) although ACC's request applied to NIH and not just one part of NIH, NIH referred the request only to NIEHS and did not search the records of any other NIH institute; (2) NIH provided information responsive only to one of the two NIH grants that funded the Zhang study; and (3) NIH declined to request records from the grantee.  (*See* Compl. ¶ 30; Admin. App'x  at 130.)  Although HHS regulations require that HHS

resolve the appeal within 30 days, *see* 45 C.F.R. § 5.35(b)(2), (c), neither NIH nor any other Defendant had responded to ACC's appeal at the time Plaintiff commenced this action.

HHS ultimately responded to ACC's appeal, by letter dated August 13, 2012, which was received after ACC commenced this action.  (*See* Admin. App'x at 137-41.)  In its letter, HHS stated that NIH "determined that the files of NCI should have been searched," and that NIH had conducted the search, which resulted in 32 pages of Chinese-language records responsive to ACC's request, "consisting of copies of the Chinese-language questionnaires" which were "administered to Study subjects."  (*Id.* at 138.)  The questionnaires were not provided to ACC, however, until October 1, 2012.  (*See* Admin. App'x at 142.)  HHS further responded that, although the NCI had located additional responsive data related to the specific factories at which Study subjects were employed, this information was exempt from production under the FOIA due to personal privacy concerns.  (*See* Admin. App'x at 138-39.)  As to other information, HHS stated that "the search . . . did not produce any additional records that were not already incorporated into the Zhang publication" or that had been produced in response to an earlier request.  (*Id.* at 138.)

Thus, to date, Defendants have failed to produce any of the requested data or other information underlying or referenced in the Zhang Study.

## ARGUMENT

A court should grant summary judgment pursuant to Federal Rule of Civil Procedure 56 where, "draw[ing] all justifiable inferences in the nonmoving party's favor," "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Campbell v. U.S. Dep't of Justice*, 193 F. Supp. 2d 29, 34 (D.D.C. 2001) (citations omitted).  In determining whether facts are "material," a court must look to the substantive law upon which each claim rests.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A

'genuine issue' is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action."  *Uhar & Co v. Jacob*, 840 F. Supp. 2d 287, 289 (D.D.C. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322. "By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment."  *Akers v. Liberty Mut. Grp.*, 847 F. Supp. 2d 21, 24 (D.D.C. 2012) (citation omitted); *see also Campbell*, 193 F. Supp. 2d at 34-35.

## I.  DEFENDANTS CANNOT SHOW THAT THEIR SEARCH FOR THE REQUESTED RECORDS WAS LEGALLY ADEQUATE UNDER THE FOIA.

Cases brought under the FOIA "typically and appropriately are decided on motions for summary judgment."  *See Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citations omitted).  The agency opposing summary judgment bears "the burden of proving that 'each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the [FOIA's] inspection requirements.'"  *ViroPharma Inc. v. Dep't of Health and Human Servs.*, 839 F. Supp. 2d 184, 189 (D.D.C. 2012) (quoting *Goland v. Cent. Intelligence Agency*, 607 F.2d 339, 352 (D.C. Cir. 1978)).  With one exception,[5]

---

[5] The lone instance in which Defendants have asserted applicability of an exemption is with respect to the specific factories at which the Zhang Study subjects were employed.  As discussed above, in its August 13, 2012 response to ACC's appeal, HHS stated that such information was exempt based on Exemption 6, *i.e.*, personal privacy.  (*See* Admin. App'x at 139.)  While ACC acknowledges that there may be a possibility of identifying the subject workers in this manner, and is amenable to reasonable measures (*e.g.*, redaction of specific variables) to avoid such disclosure, ACC does not accept HHS' blanket invocation of the exemption as legally sufficient. Subject to Defendants' willingness to develop a reasonable approach to this issue, ACC hereby reserves its right to challenge this aspect of HHS' denial, including by moving this Court for an index under *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

Defendants have not claimed that the records requested by ACC fall within any of the exemptions enumerated in the FOIA.

A.      **Defendants Must Provide A Detailed Affidavit Regarding Their Search of the NCI Files.**

Where, as here, a plaintiff challenges the adequacy of an agency's search in response to a request under the FOIA, the agency must "establish beyond material doubt that it has conducted a good faith search that is reasonably calculated to uncover all relevant records." *Wilbur v. Cent. Intelligence Agency*, 273 F. Supp. 2d 119, 124 (D.D.C. 2003) (citation omitted).  "The issue is not whether there might possibly exist other records that are responsive to the request, but whether the search was adequate, judged by a reasonableness standard." *Id.*  Although the agency need not "speculate about potential leads," it is "required to follow through on obvious leads to discover requested documents." *Id.* (citations omitted).  To that end, courts have deemed agency search efforts inadequate where evidence indicates that responsive documents are likely to be contained in an agency's files, yet the search does not return responsive documents. *See, e.g.*, *Friends of Blackwater v. Dep't of the Interior*, 391 F. Supp. 2d 115, 120-22 (D.D.C. 2005) (search inadequate where other documents appearing to have originated within Fish & Wildlife Service ("FWS") Director's office were produced by the Department of the Interior, yet "no drafts or related correspondence were turned up" in search of FWS files).  In response to a challenge to the adequacy of its search, an agency "must provide a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive records were searched." *See id.* at 119 (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

The fact that Defendants' search of the NCI files – undertaken only after ACC challenged NIH's failure to do so altogether in the first instance – turned up only 32 pages of responsive,

non-exempt documents, all in Chinese, casts serious doubt on the adequacy of that search. Because the Zhang Study itself indicated that NCI-affiliated scientists were actively involved in the Study, those scientists are likely to possess a significant amount of information responsive to the request.  Moreover, Dr. Zhang's application, submitted to obtain funding for the Study, identified several NCI-affiliated scientists proposed to serve as "unpaid consultant[s]" for the study, and stated that NCI biostatisticians would receive certain data in coded form for analysis. (*See* Admin. App'x at 79-80, 98.)   Indeed, in a letter of support for the study, these NCI scientists described their willingness to make available to Zhang "detailed information on demographic factors and other potential confounders for each study subject, and on formaldehyde exposure in study factories," which information would "allow [Zhang] to accomplish all the specific aims of [her] proposal." (*See id.* at 123-24.)  That letter also indicated that NCI had conducted duplicate analysis of formaldehyde exposures among the Zhang Study subjects and "unexposed controls." (*Id.* at 123.)  The letter noted that the "[b]iologic samples"[6] obtained during this duplicate analysis had been "exported from China" and were being stored at NCI biorepositories in Maryland.  (*Id.*)  Further, the NCI scientists stated that they "would be pleased to work with [Zhang] and [her] biostatistics colleagues in the analysis and interpretation of data that would be generated from this proposal." (*Id.*)

In view of these positive indications of the requested information being within the possession of NCI, and given the scant collection of documents produced, ACC has reason to believe that Defendants' search of the NCI files was not adequate.  Defendants must provide a detailed affidavit describing the search.

---

[6] Typically, such biologic samples would include the results of respiratory infection examinations and standard liver and kidney chemistry, as well as height, weight and blood pressure measurements.

**B.    Defendants Must Produce The Requested Information In Accordance With The Procedures Established Under The FOIA.**

**1.    The FOIA, The Shelby Amendment, OMB Circular A-110 And HHS Regulations Require Defendants To Produce The Requested Information, And To Obtain From The Grantees Information Which Defendants Do Not Possess.**

Congress enacted the FOIA to ensure that the public has access to information possessed by the government. *See* S. Rep. No. 88-813, at 38 (1966) ("It is the purpose of the present bill . . . to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language and to provide a court procedure by which citizens . . . may obtain information wrongfully withheld."). To that end, the FOIA is structured so that "virtually every document generated by an agency is available to the public in one form or another, unless it falls within one of the Act's nine exemptions." *Nat'l Labor Relations Bd. v. Sears*, 421 U.S. 132, 136 (1975). As originally drafted, however, there was a question as to whether the FOIA provided the public with access to materials generated by non-governmental researchers who developed those materials pursuant to federally-funded studies. In *Forsham v. Harris*, 445 U.S. 169, 179-80 (1980), the Supreme Court held that such data were not "agency records" obtainable through the FOIA. Likewise, OMB Circular A-110, "Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations," which sets forth the standards applicable to federal research grants, originally did not require that grant recipients make federally-funded research data available to the public.

In 1998, however, Congress passed legislation, commonly referred to as the Shelby Amendment (due to its sponsorship by Senator Richard Shelby), Pub. L. No. 105-277, Title III, 112 Stat. 2681 (Oct. 21, 1998), to ensure public access to data that are developed through federally-funded research carried out by, *inter alia*, institutions of higher education. Specifically,

- 11 -

the Shelby Amendment requires the OMB to "amend[] Section __.36 of OMB Circular A-110 to require Federal awarding agencies to ensure that all data produced under an award will be made available to the public through the procedures established under the [FOIA]." *Id.*[7]  The Shelby Amendment further provides that "if the agency obtaining the data does so solely at the request of a private party, the agency may authorize a reasonable user fee equaling the incremental cost of obtaining the data." *Id.*  Congress thus created a right for the public to obtain such data through the procedures set forth in the FOIA.

In 1999, as required by the statute, the OMB amended Circular A-110 to provide:

> [I]n response to a [FOIA] request for research data relating to published research findings produced under an award that was used by the Federal Government in developing an agency action that has the force and effect of law, the Federal awarding agency shall request, and the recipient shall provide, within a reasonable time, the research data so that they can be made available to the public through the procedures established under the FOIA.  If the Federal awarding agency obtains the research data solely in response to a FOIA request, the agency may charge the requester a reasonable fee equaling the full incremental cost of obtaining the research data.

Final Revision to OMB Circular A-110, 64 Fed. Reg. 54,926 (Oct. 8, 1999) (codified at 2 C.F.R. § 215.36(d)).  HHS promulgated a regulation to comply with the revised Circular A-110.  The HHS regulation provides, in part:

> [I]n response to a [FOIA] request for research data relating to published research findings produced under an award that were used by the Federal Government in developing an agency action that has the force and effect of law, the HHS Awarding Agency shall request, and the recipient shall provide, within a reasonable time, the research data so that they can be made available to the public through the procedures established under the FOIA.  If the HHS Awarding Agency obtains the research data solely in response to a FOIA request, the agency may charge the requester a reasonable fee equaling the full incremental cost of obtaining the research data.

---

[7] For brevity, we refer to Section ___.36 as "Circular A-110."

45 C.F.R. § 74.36(d)(1).

Thus, "HHS regulations, adopted pursuant to OMB Circular A-110, now require the agency to request such research data even if they are not, at the time of the FOIA request, in the agency's possession." *Pohl v. EPA*, No. 09-1480, 2010 WL 4388071, at *5 (W.D. Pa. Oct. 29, 2010).  In *Pohl*, the court also stated that the "FOIA itself does not contain this requirement and cannot provide an adequate remedy for the agency's failure to do so."  *Id.*  The court in *Pohl* therefore upheld the plaintiff's APA claim, requiring the agency to obtain the requested study data for production through APA procedures.  *See id.*  We discuss ACC's APA claim (following *Pohl*) in Section II, below.

However, the more reasonable reading is that the Shelby Amendment, by its terms, renders the procedures established under the FOIA available to Plaintiff through the directive set forth in Circular A-110.  HHS appears to read the statute, as well as Circular A-110, as we do: "[I]n response to a [FOIA] request . . . the HHS Awarding Agency shall request, and the recipient shall provide . . . the research data so that they can be *made available to the public through the procedures established under the* [FOIA]."  45 C.F.R. § 74.36(d)(1) (emphasis added).  The Department of Justice agrees that "certain research data generated through federal grants are considered agency records and subject to the FOIA."[8]

---

[8] The Department of Justice explains:

> The [Shelby Amendment], partly overruling longstanding Supreme Court precedent of *Forsham v. Harris*, required OMB to revise its Circular A-110 (the regulatory publication by which OMB sets the rules governing grants from all federal agencies to institutions of higher education, hospitals, and nonprofit institutions) so that "all data produced under an award will be made available to the public through the procedures established under the Freedom of Information Act."  The revised version of Circular A-110 requires agencies to respond to FOIA requests for certain grantee research findings by obtaining the requested data from the grantee and processing it for release to the requester.

Footnote continued on next page

This reading comports with the D.C. Circuit's four-factor test for determining whether an agency exercises sufficient control over a document to render it an "agency record" under the FOIA:

> (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

*ExxonMobil Corp. v. Dep't of Commerce*, 828 F. Supp. 2d 97, 106 (D.D.C. 2011) (quoting *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996)).  Here, the creators of the requested data, Dr. Zhang and her colleagues, are *obligated by regulation* to relinquish the information upon request, *see* 45 C.F.R. § 74.36(d)(1), and the OMB regulations give the awarding agency the express right to "[o]btain, reproduce, publish or otherwise use" the data at any time as it sees fit, *see* 2 C.F.R. § 215.36(c).  As discussed below, HHS cited the Zhang Study in support of its listing decision for formaldehyde in the 12th RoC, and thus relied on the data, whether or not the data are physically "integrated into the agency's record system."  Because several coauthors of the Zhang Study are NCI employees, it is reasonable to infer that they read and relied on the information, as well.

**2.      Defendants' Justifications For Failing To Provide The Zhang Study Data Are Incorrect As A Matter Of Law.**

In an attempt to justify its failure to provide the Zhang Study data, NIH stated that Circular A-110 does not apply to the Study data.  (*See* Compl. ¶ 28; Admin. App'x at 24.)  According to NIH, the provisions of Circular A-110 apply only to data which are: (1) first

---

Footnote continued from previous page
*See* Dep't of Justice Guide to the Freedom of Information Act, Procedural Requirements, at 36 (Jan. 2009) *available at* http://www.justice.gov/oip/foia_guide09/procedural-requirements.pdf (last visited Nov. 1, 2012) (Exhibit 7).

produced under a new or competing continuing grant awarded after April 17, 2000, and (2) cited publicly and officially by the Federal government in support of an agency action that has the force and effect of law.  (*See id.*)  The relevant grants for the Zhang Study were awarded well after April 17, 2000.  Therefore, we assume that NIH was attempting to invoke the portions of the OMB and HHS regulations making the FOIA applicable to "research data relating to published research findings produced under an award that were used by the [Federal Government or HHS Awarding Agency] in developing an agency action that has the force and effect of law," 45 C.F.R. § 74.36(d)(1); 2 C.F.R. § 215.36(d)(1).  NIH's attempt to rely upon the regulations in this fashion fails for several reasons.

*First*, the OMB and HHS regulations may not curtail the scope of the Shelby Amendment by imposing limitations that are inconsistent with the statute's plain language and purpose.  *See, e.g.*, *Sullivan v. Zebley*, 493 U.S. 521, 536-37 (1990) (invalidating HHS regulations for determining whether a child is disabled as inconsistent with the Social Security Act); *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 105-06 (D.C. Cir. 2005) (striking down regulations implementing Bipartisan Campaign Reform Act as not consistent with the statute).  The Shelby Amendment requires the OMB regulation to "require Federal awarding agencies to ensure that *all* data produced under an award will be made available to the public through the procedures established under the [FOIA]."  Pub. L. No. 105-277, Title III, 112 Stat. 2681 (emphasis added.) This statutory language contains no ambiguity or delegation that permits HHS to make available to the public only *some* data produced under an award, *e.g.*, only data that were used by the Federal Government in developing an agency action that has the force and effect of law.  To the extent that the OMB and HHS regulations purport to exempt data from disclosure on a basis that is not found in the statute, that part of the regulations is invalid.

*Second*, even if the OMB and HHS regulations were valid in this respect, NIH's apparent justification here – that the data must have been "[c]ited publicly and officially by the Federal Government in support of an agency action" – does not satisfy the text of the regulation.  The regulations contain no requirement that the data must be "cited publicly and officially" in support of agency action.  Rather, the regulations require the "published research findings" to have been "used by the Federal Government in developing an agency action that has the force and effect of law," 45 C.F.R. § 74.36(d)(1).

*Third*, the Zhang Study meets the OMB and HHS regulatory requirements for public disclosure, were these requirements to be valid.  The requested data relate to "published research findings," s*ee* Zhang Study at 84-87, and the Zhang Study was used in developing an agency action that has the force and effect of law.[9]  HHS cited the Zhang Study in support of its substance profile and listing decision for formaldehyde as a known human carcinogen in the 12th RoC.  *See* 12th RoC at 199.  Because the RoC is mandated by Congress, the revised listing for formaldehyde as a known human carcinogen in the 12th RoC constitutes an agency action having the force and effect of law for purposes of Circular A-110.

---

[9] In the final revision implementing the Shelby Amendment, the OMB acknowledged that there may be some circumstances in which an agency action does not amount to a regulation but nevertheless has the force and effect of law.  *See* 64 Fed. Reg. at 54,928.  In fact, an earlier version of the revision confined research data obtainable through the FOIA and revised Circular A-110 to data that are used by the federal government in "developing a regulation."  *Id.*  In response to comments, however, the OMB changed the language to "agency actions having the full force and effect of law."  *Id.*  In describing the change, the OMB stated:

> We note that a comment letter from Senators Shelby, Lott, Campbell, and Gramm stated that the revision should not be limited to regulations, but should apply generally to "federal actions that can dramatically impact the public."  Agency actions that have "the force and effect of law" certainly represent "federal actions that can dramatically impact the public."  Indeed, it is through actions that have the force and effect of law that an agency (in the words of one business association) "imposes costs, mandates, restrictions, obligations and responsibilities on the regulated community."

*Id.*

Listing of a substance in the RoC also has the force and effect of law because it automatically triggers substantive legal requirements.  Following are examples of such legal requirements.[10]

(1)  Listing a chemical in the RoC automatically requires a person who manufactures, imports or uses that chemical to comply with federal health and safety regulations that incorporate the RoC.  For example, OSHA both requires chemical manufacturers and importers to classify the hazards of chemicals which they produce or import, and requires all employers to provide information to their employees about the "hazardous" chemicals in the workplace, in the form of labels, warnings, safety data sheets and other information.  *See* 29 C.F.R. § 1900.1200(b)(1).

Carcinogenicity is one such hazard.  *See id.* § 1910.1200(c) (definition of "[h]ealth hazard").  OSHA's regulations expressly provide that "[c]hemical manufacturers, importers and employers evaluating chemicals shall treat the following sources as establishing that a chemical is a carcinogen or potential carcinogen for hazard communication purposes . . . National Toxicology Program (NTP), Annual Report on Carcinogens (latest edition)."  *Id.* § 1910.1200(d)(4)(i).  OSHA specifies in detail the nature of the communications required for such chemicals.  *See id.* § 1910.1200(g)(2).  Thus, listing formaldehyde in the RoC automatically triggers the OSHA hazard communication requirements.  In particular, as a result of the inclusion of formaldehyde in the 12th RoC, OSHA requires manufacturers and importers of formaldehyde to obtain or develop material safety data sheets containing information with respect to formaldehyde's classification as a known human carcinogen.

---

[10] "[S]ubstantive agency regulations have the 'force and effect of law.'"  *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979)).  An agency action is "substantive" if it "affect[s] individual rights and obligations."  *Brown*, 441 U.S. at 302 (citation omitted).

(2)   EPA requires exporters to submit a notice of export to EPA of certain chemicals containing more than 0.1% of a "known or potential human carcinogen," which EPA defines, *inter alia*, as a chemical being listed in the RoC.  40 C.F.R. § 707.60(c)(2)(i).  Again, listing in the RoC has the force and effect of law because it automatically triggers substantive legal requirements.

(3)   EPA cited the Zhang Study in support of EPA's draft Integrated Risk Information System ("IRIS") Toxicological Review of formaldehyde, a document that serves as the basis for federal and state determinations with respect to health risks.  *See* EPA, *Toxicological Review of Formaldehyde – Inhalation Assessment (CAS No. 50-00-0) in Support of Summary Information on the Integrated Risk Information System (IRIS)*, at 4-514, 4-530, 4-531–36 (draft dated June 2, 2010); *see also* EPA, IRIS, FAQs, *at* www.epa.gov/iris/help_ques.htm (last visited Nov. 1, 2012) ("These risk characterizations can form the basis for risk-based decision-making, regulatory activities, and other risk management decisions designed to characterize and protect public health.") (Exhibit 11).

For example, once finalized, EPA's toxicity values are used to: (1) promulgate National Emission Standards for Hazardous Air Pollutants pursuant to Section 112 of the Clean Air Act which, among other things, require industrial sectors that emit these substances to implement and adhere to specified emission control procedures;[11] (2) designate chemicals and combinations of chemicals as a "significant new use" under the Toxic Substances Control Act, which designation requires persons who intend to manufacture or import those chemicals to notify EPA at least 90

---

[11]   *See, e.g.*, National Emissions Standards for Hazardous Air Pollutants: Mineral Wool Production and Wool Fiberglass Manufacturing, 76 Fed. Reg. 72,770, 72,780 (Nov. 25, 2011).

days in advance of such manufacture or import;[12] and (3) conduct periodic reviews of national drinking water standards to determine whether any revisions are required to limit the levels of chemicals in the public water supply.[13]  By publicly citing the Zhang Study in support of its draft IRIS Toxicology Review, EPA has "used" the Zhang Study "in developing agency action that has the force and effect of law."

**II.   ALTERNATIVELY, DEFENDANTS HAVE A LEGAL OBLIGATION THAT MUST BE ENFORCED THROUGH THE APA.**

As noted above, the *Pohl* court suggested that the FOIA might not afford complete relief in a case like this, and that the Court therefore might need to rely on the APA.  Where a party moves for summary judgment on a claim brought under the APA, courts typically treat the motion as seeking review of an administrative decision.  *See, e.g.*, *Brodie v. U.S. Dep't of Health & Human Servs.*, 796 F. Supp. 2d 145, 150 (D.D.C. 2011).  "Summary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review," which "requires courts to hold unlawful and set aside agency action, findings, and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* (citations omitted).  An agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (citation omitted).

---

[12] *See, e.g.*, Certain Polybrominated Diphenylethers; Significant New Use Rule and Test Rule, 77 Fed. Reg. 19,862, 19,868-69 (Apr. 12, 2010).

[13] *See, e.g.*, National Primary Drinking Water Regulations; Announcement of the Results of EPA's Review of Existing Drinking Water Standards, 75 Fed. Reg. 15,500, 15,507 (Mar. 29, 2010).  (*See also* <u>Exhibit 8</u> ("These risk characterizations can form the basis for risk-based decision-making, regulatory activities, and other risk management decisions designed to characterize and protect public health.").)

**A.** **ACC's Claim Satisfies The Threshold Requirements Under The *Norton* Framework.**

The APA authorizes suit by "[a] person suffering legal wrong because of [an] agency action." *See* 5 U.S.C. § 702. Where no other statute provides a private right of action, the "agency action" complained of must be "final" agency action. *Id.* § 704. An "agency action" reviewable under the APA includes the "failure to act." *Id.* § 551(13). "A 'failure to act' is not the same thing as a 'denial.' The latter is the agency's act of saying no to a request; the former is simply the omission of an action without formally rejecting a request." *Norton v. So. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

The Supreme Court in *Norton v. Southern Utah Wilderness Alliance* held that an action to compel agency action under the APA is authorized if two prerequisites are satisfied: (1) the plaintiff has identified an agency failure to take a "discrete agency action"; and (2) the action is one that the agency is "legally required" to take. *See id.* at 62; *see also Blancett v. U.S. Bureau of Land Mgmt*, No. Civ. A. 04-2152, 2006 WL 696050, at *4 (D.D.C. Mar. 20, 2006). ACC's claim satisfies both of these prerequisites.

**1.** **Defendants Have Failed To Take A Discrete Agency Action.**

The *Norton* Court construed the phrase "failure to act" as a failure to take one of the five agency actions enumerated in 5 U.S.C. § 551(13), *i.e.*, a rule, order, license, section or relief. *See Norton*, 542 U.S. at 62. "Relief" is defined under the APA, in relevant part, to mean the "taking of other action on the application or petition of, and beneficial to, a person." 5 U.S.C. § 551(13). The Court further emphasized that, in all cases, "a 'failure to act' is properly understood to be limited . . . to a discrete action." *Norton*, 542 U.S. at 62-63. In this case, Defendants unlawfully have failed to undertake the discrete action of obtaining data developed pursuant to a federally-

funded study from the grantee who generated the data, in response to a request duly submitted by ACC in accordance with the procedures established under the FOIA.

> ### 2. Defendants Are Legally Required To Obtain The Data From The Grantee.

Neither Circular A-110 nor the HHS regulations implementing it may be read in the permissive sense. To the contrary, they provide that the agency "*shall* request," and that the grantee "*shall* provide research data so that they can be made available to the public through the procedures established under the FOIA." 2 C.F.R. § 215.36(b); 45 C.F.R. § 74.36(d)(1). The use of the word "shall" in this context is unambiguous: agencies have an obligation, and not simply an option, to request the data. *See, e.g.*, *N. Colo. Water Conservancy Dist. v. Fed. Energy Reg. Comm'n*, 730 F.2d 1509, 1517 (D.C. Cir. 1984) (finding the use of the word "shall" in the Federal Power Act to be unambiguous, thus depriving agency of flexibility in implementing it); *see also Beaty v. Food & Drug Admin.*, 853 F. Supp. 2d 30, 37-38 (D.D.C. 2012) ("The word 'shall' generally indicates a command that admits of *no* discretion on the part of the person instructed to carry out the directive." (quoting *Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v. Fed. Labor Relations Auth.*, 22 F.3d 1150, 1153 (D.C. Cir. 1994))).

That federal agencies are legally obligated to take these steps is confirmed both by the text of the Shelby Amendment (directing the OMB Director to amend Circular A-110 "*to require* Federal awarding agencies *to ensure* that all data produced under an award *will be made available to the public*") (emphasis added), and by the OMB's implementation of the Shelby Amendment. For example, in explaining the structure of revised Circular A-110, the OMB explained that the revised circular "*requires* Federal awarding agencies, in response to a FOIA request, to *obtain* the requested data" from the grantee. Request for Comments on Clarifying Changes to Proposed Revision on Public Access to Research Data, 64 Fed. Reg. 43,786, 43,788

(Aug. 11, 1999) (emphasis added).  The OMB further noted that "[s]ince the agency *must* take

steps to obtain the data, the agency is afforded a reasonable time to do so."  *Id.* (emphasis added).

## III.   THE SHELBY AMENDMENT AND OMB CIRCULAR A-110 CREATE A MINISTERIAL DUTY THAT MAY BE ENFORCED THROUGH MANDAMUS.

The federal mandamus statute provides that the "district courts shall have original

jurisdiction of any action in the nature of mandamus to compel an officer or employee of the

United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

The D.C. Circuit has held that mandamus is proper only where: "(1) the plaintiff has a clear right

to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy

available to the plaintiff."  *Citizens for Responsibility & Ethics in Wash. v. U.S. Secs. & Exch.*

*Comm'n*, 858 F. Supp. 2d 51, 64 (D.D.C. 2012) (quoting *Council of & for the Blind of Del. Cnty.*

*Valley v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983)).  Further, the party seeking mandamus

bears the burden of showing that its right to the writ is "clear and indisputable."  *See id.* (quoting

*Gulfstream Aero. Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988)).  To the extent that

neither the FOIA nor the APA provide relief to ACC, mandamus is available.

ACC has a right to the Zhang Study data because the Shelby Amendment explicitly

requires the OMB, through the amended Circular A-110, to require Defendants "to ensure that

*all* data produced under an award" – including data in the possession of Defendants' grantees –

"will be made available to the public through the procedures established under the [FOIA]."

Congress made its intent clear by placing a single, narrow limitation on that right, *i.e.*, that the

agency obtaining the data may require user fees for the cost of doing so.

Similarly, the duty of agencies to obtain documents from grantees pursuant to the Shelby

Amendment is non-discretionary.  This is evidenced by the mandatory nature of Circular A-110

and the HHS regulations: in response to a request under the FOIA, "the HHS Awarding Agency

*shall* request, and the recipient *shall* provide," the requested data, 45 C.F.R. § 74.36(d)(1) (emphasis added).  This language leaves no room for discretion.  *See, e.g.*, *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 97 (D.D.C. 2007) ("The term 'shall,' of course, is a mandatory one denoting a non-discretionary duty." (citing *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644 (2007))); *see also United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its  intent that [forfeiture under the civil forfeiture statute] be mandatory in cases where the statute applied."); *Pierce v. Underwood*, 487 U.S. 552, 569-70 (1988) (Congress' use of "shall" in housing statute constitutes "mandatory language").

If this Court were to find that neither the FOIA nor the APA provides relief to ACC, ACC then would have no other means to obtain the data.  Accordingly, ACC would lack another adequate remedy, and mandamus would be proper.

**CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that the Court grant this motion.

Dated:   November 8, 2012

Respectfully submitted,

/s/ Blake A. Biles
Blake A. Biles
(D.C. Bar No. 441679)
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C.  20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
E-mail: blake.biles@aporter.com

Kent A. Yalowitz
*Pro hac vice*
ARNOLD & PORTER LLP
399 Park Avenue
New York, N.Y.  10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399
E-mail: kent.yalowitz@aporter.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN CHEMISTRY COUNCIL, INC., | : | |
| | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:12-cv-01156-JEB |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, NATIONAL INSTITUTES OF HEALTH, NATIONAL INSTITUTE OF ENVIRONMENTAL HEALTH SCIENCES and NATIONAL CANCER INSTITUTE, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**STATEMENT OF MATERIAL FACTS AS TO WHICH PLAINTIFF CONTENDS
THERE IS NO MATERIAL ISSUE**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Plaintiff American Chemistry Council, Inc. respectfully submits the following statement material facts not in genuine dispute:

1.     By letter dated November 7, 2011, pursuant to the Freedom of Information Act (the "FOIA"), Plaintiff submitted a request to the National Institute of Health ("NIH") for copies of records related to a study authored by Dr. Luoping Zhang of the University of California at Berkeley School of Public Health and several other persons, including individuals who are affiliated with the National Cancer Institute ("NCI") (the "Zhang Study").

2.     The Zhang Study was the subject of a research article published in 2010 in the Journal of Cancer, Epidemiology, Biomarkers & Prevention entitled *Occupational Exposure to*

*Formaldehyde, Hematotoxicity, and Leukemia-Specific Chromosome Changes in Cultured Myeloid Progenitor Cells*.

3.     Grants awarded after April 2000 from the Intramural Research Program of the NIH (NCI) and from the NIEHS funded the Zhang Study (grants R01ES017452 and P42ES004705, respectively).

4.     The Zhang Study evaluated the potential health effects of exposure to formaldehyde, including carcinogenicity, by examining a group of 94 workers in China.  The authors concluded that formaldehyde exposure can have an adverse effect on the hematopoietic system, and that induction of leukemia (a type of cancer) by formaldehyde is "biologically plausible."

5.     In 2010, the U.S. Environmental Protection Agency ("EPA") cited the Zhang Study in support of EPA's draft *Toxicological Review of Formaldehyde – Inhalation Assessment* for inclusion in EPA's Integrated Risk Information System.

6.     In 2011, the U.S. Department of Health and Human Services ("HHS") published the 12th Edition of the Report on Carcinogens (the "12th RoC"), which listed formaldehyde as "known to be a human carcinogen" based upon an association with certain cancers, including lymphohematopoietic cancer, specifically myeloid leukemia.  HHS cited the Zhang Study in support of its listing decision for formaldehyde in the 12th RoC.

7.     As a result of the inclusion of formaldehyde in the 12th RoC, the Occupational Safety and Health Administration requires manufacturers and importers of formaldehyde to obtain or develop material safety data sheets containing information with respect to formaldehyde's classification as a known human carcinogen.

8.      In its November 7, 2011 letter, Plaintiff specifically requested records related to: (a) the Zhang Study's protocol and methodology; (b) information and data obtained regarding the subjects of the Study; and (c) analyses, results, findings and conclusions of the Study.

9.      NIH acknowledged receipt of Plaintiff's request by letter dated November 17, 2011.  By letter dated December 1, 2011, NIH issued a "final response" which included 108 pages of material deemed by NIH to be "responsive" to Plaintiff's request, consisting of the Application for Federal Assistance for Grant #R01ES017452-01 submitted by Dr. Zhang in 2008.

10.     In responding to the request, NIH did not request records from the Study's author, *i.e.*, the grantee.  Rather, NIH stated that NIH was not required to do so because the data did not meet both of the following criteria: (a) first produced under a new or competing continuing grant awarded after April 17, 2000; and (b) cited publicly and officially by the federal government in support of an agency action that has the force and effect of law.  NIH stated that the data requested by Plaintiff did not meet one or both of those criteria; accordingly, NIH did not forward the request to the grantee.

11.     By letter to HHS dated January 4, 2012, Plaintiff timely appealed NIH's December 1, 2011 response.  HHS responded to ACC's appeal, by letter dated August 13, 2012, which was after ACC commenced this action.  HHS stated that it had searched the files of the NCI and located 32 pages of Chinese-language questionnaires which were responsive to ACC's request.  HHS further stated that: (a) although the NCI had located additional responsive data related to the specific factories at which Zhang Study subjects were employed, this information was exempt from production under the FOIA due to personal privacy concerns; and (b) HHS' search did not result in discovery of any additional responsive documents.

Dated:  November 8, 2012                     Respectfully submitted,

                                             /s/ Blake A. Biles
                                             Blake A. Biles
                                             (D.C. Bar No. 441679)
                                             ARNOLD & PORTER LLP
                                             555 12th Street, N.W.
                                             Washington, D.C.  20004
                                             Telephone: (202) 942-5000
                                             Facsimile: (202) 942-5999
                                             E-mail: blake.biles@aporter.com

                                             Kent A. Yalowitz
                                             *Pro hac vice*
                                             ARNOLD & PORTER LLP
                                             399 Park Avenue
                                             New York, N.Y.  10022
                                             Telephone: (212) 715-1000
                                             Facsimile: (212) 715-1399
                                             E-mail: kent.yalowitz@aporter.com